```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         NORTHERN DIVISION

STACEY FESSENDEN,                 )
                                  )
         Plaintiff,               )
                                  )
    v.                            )   No. 2:10 CV 31 DDN
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
         Defendant.               )
```

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Stacey Fessenden for Supplemental Security Income under Title XVI of the Social Security Act (the Act), 42 U.S.C. 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

**I. BACKGROUND**

Plaintiff was born in 1976. She filed an application for Supplemental Security Income on March 12, 2007, alleging disability due to a learning disability, scoliosis,[1] and depression since February 3, 2007, her alleged onset date. (Tr. 203.) Her claim was denied initially, and she requested a hearing before an ALJ. (Tr. 4, 178.)

On June 26, 2008, following a hearing before an ALJ, plaintiff was found not disabled. (Tr. 5-18.) On February 26, 2010, the Appeals Council denied her request for review. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1]Abnormal lateral and rotational curvature of the vertebral column. Stedman's Medical Dictionary 1734 (28th Ed. 2006).

## II. MEDICAL HISTORY

On September 29, 2003, plaintiff underwent a consultative psychological examination by licensed psychologist Jerry Aamoth, M.S. (Tr. 278-80.) His diagnostic impressions included ruling out reading disability and borderline intellectual functioning or mild mental retardation. (Tr. 280.) He saw no signs of depression. He assigned a Global Assessment of Functioning (GAF) score[2] of 50, which describes serious impairments. (Id.) Mr. Aamoth did not perform IQ testing, but opined that such testing could clarify any intellectual concerns. (Id.)

On October 29, 2003, spinal X-rays were taken. Kevin Coakley, M.D., noted left thoracic scoliosis with a spinal curvature of about 16 degrees. He also noted a mild right thoracolumbar curve. The lumbar spine was otherwise negative. (Tr. 281-82.)

On February 15, 2005, plaintiff underwent a consultative psychological examination and intellectual evaluation by David A. Lipsitz, Ph.D., upon referral by the state. (Tr. 283-85.) Dr. Lipsitz administered the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) to plaintiff, which revealed IQ scores of Verbal 73, Performance 86, and Full Scale 77. (Tr. 283.) Dr. Lipsitz considered the results valid. (Id.) The results of intellectual testing suggested that plaintiff was functioning within the upper part of the "borderline" range. (Tr. 284.) He diagnosed learning disability, borderline intellect, and assigned GAF score of 60, indicating moderate impairment. (Tr. 285.) Dr. Lipsitz stated that plaintiff's vocabulary, which he generally considered the single best indicator of intellectual potential, was extremely poor; that her knowledge of mathematical functions was poor; that she had difficulty concentrating on a task in order to put forth a good mental effort; that she tended to take a trial and error approach to problem solving and frequently made careless and impulsive mistakes; that her

---

[2]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

-2-

short-term and long-term memory were both deficient; that her general range of knowledge was narrow; that her social awareness and judgment were poor; and that she was unable to make adequate generalizations based on past social experiences. (Tr. 283-84.)

On February 27, 2006, plaintiff underwent a psychiatric evaluation by Carol Greening, APN, in connection with the development of an Individual Treatment and Rehabilitation Plan for the Missouri Department of Mental Health. (Tr. 286-88, 289-91.) Nurse Greening diagnosed recurrent, moderate, major depressive disorder, and assigned a GAF score of 64, indicating moderate symptoms. (Tr. 290.) Her antidepressant medication was changed from Prozac to Celexa. (Tr. 291.)

On February 26, 2007, plaintiff underwent an annual psychosocial/clinical assessment at Preferred Family Health Care. She was given the same diagnoses and GAF score as the previous year. (Tr. 293-97.)

Plaintiff was treated by Mark A. Tucker, D.O., from January 3, 2006 to March 19, 2008. (Tr. 298-340, 368-82, 388-401.) On January 3, 2006, plaintiff reported pain in her back and left hand, as well as depression. (Tr. 338.) Dr. Tucker diagnosed chronic depression, chronic fibromyalgia,[3] and gastroesophageal reflux disease or GERD. (Tr. 340.) On January 31, 2006, she complained of migraines, depression, and increased low back pain. (Tr. 335.) Dr. Tucker noted reduced range of motion (ROM) of the cervical, thoracic, and lumbar spine, and described plaintiff as manic and anxious. (Tr. 336.) He diagnosed chronic bipolar disorder, acute somatic or trunk dysfunction of the cervical, thoracic, and lumbar spine, and chronic fibromyalgia. (Tr. 337.)

On March 1, 2006, plaintiff complained of aches and stiffness and requested medication refills. (Tr. 332.) Dr. Tucker found reduced ROM of the cervical, thoracic, and lumbar spine. (Tr. 333-34.) On May 30, 2006, Dr. Tucker added obesity to her diagnoses. She was 5 feet, 3.5 inches tall and weighed 203 pounds. (Tr. 323-25.) On August 23, 2006, Dr. Tucker diagnosed left lumbar radiculopathy, a disorder of the spinal

---

[3]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. Stedman's at 725.

-3-

nerve roots, and left median radiculopathy. He repeated these diagnoses on September 23, 2006. (Tr. 312, 316.)

On October 23, 2006, plaintiff saw Dr. Tucker with increased back pain. He treated her with osteopathic manipulation. (Tr. 310.) He added chronic right thoracic scoliosis to her diagnoses. (Id.) On November 20, 2006, plaintiff reported numbness in her left hand, as well as neck and back pain. Dr. Tucker diagnosed nerve impingement and metabolic syndrome. (Tr. 308-09.)

On December 8, 2006, plaintiff was seen for a severe ankle sprain. An x-ray revealed no fracture. (Tr. 306.) On December 18, 2006, an EMG test to determine the cause of her nerve impingement was normal. (Tr. 304.)

On February 12, 2007, plaintiff saw Dr. Tucker for low back pain and GERD. (Tr. 299-300.) At that time, she was also taking a supplement for hypothyroidism. (Id.) Dr. Tucker treated her with an osteopathic manipulation to the lumbar spine, noting "good results." On March 15, 2007, she was seen again for back pain evaluation after reporting worsening back pain and increased difficulty sleeping. She also reported feeling better because she was exercising every day now and tolerating her thyroid supplement well. (Tr. 298.)

On April 12, 2007, Dr. Tucker saw plaintiff for possible pregnancy. A pregnancy test was negative. Dr. Tucker observed reduced ROM of the right lumbar spine and right thoracic spine, and good ROM of the remaining cervical and thoracic spine. He administered osteopathic manipulation with "good results." (Tr. 381-82.)

On April 23, 2007, Stanley Hutson, Ph.D., a non-examining, non-treating psychologist, completed a Psychiatric Review Technique form. He opined that plaintiff had mild restriction in activities of daily living and mild difficulties in maintaining concentration, persistence, or pace, due to her learning disability, borderline intellectual functioning, and history of major depressive disorder. (Tr. 346-56.) Dr. Hutson also completed a Mental Residual Functional Capacity (RFC) Assessment form the same day, opining that plaintiff had moderate limitations in her ability to deal with detailed instructions and to maintain attention and concentration for extended periods. (Tr. 357-59.)

On May 10, 2007, Dr. Tucker changed plaintiff's pain medication from hydrocodone, a narcotic analgesic, to methadone, also a narcotic analgesic, after she reported the hydrocodone was no longer working. He observed reduced ROM of the left lumbar and left thoracic spine and administered osteopathic manipulation. Dr. Tucker diagnosed chronic strain of the lumbar sacral spine. (Tr. 379-80.)

On June 7, 2007, plaintiff saw Dr. Tucker with complaints of drowsiness from the methadone. Her dosage was adjusted. (Tr. 378.) On July 5, 2007, she reported that her primary problem was low back pain. She also complained of a burning sensation and swelling in her right hand, as well as swelling and tenderness of the knees. (Tr. 376.) Dr. Tucker observed some reduced ROM of the right lumbar, right thoracic, and right cervical spine, as well as chronic scoliosis of the right lumbar thoracic area, swelling of both knees, tenderness of the hand along the wrist, and some epigastric tenderness to palpation. (Id.) He diagnosed fibromyalgia, somatic dysfunction of the cervical, thoracic, and lumbar spine, chronic scoliosis of the lumbar thoracic junction area on the right, degenerative joint disease of the knees, suspected right carpal tunnel syndrome, and GERD. (Id.) Dr. Tucker administered osteopathic manipulation and referred her to an orthopedic physician. (Id.)

On August 2, 2007, plaintiff reported that she was doing very well with pain control and feeling "great." She reported quitting smoking "some time ago." However, she complained of reflux symptoms and had run out of reflux medication. (Tr. 373-74.) Dr. Tucker noted pinpoint areas of tenderness consistent with fibromyalgia. (Id.)

On August 30, 2007, plaintiff reported "terrible" low back pain and that the methadone was making her nauseous. (Tr. 372.) Dr. Tucker discontinued methadone and replaced it with hydrocodone. He also restarted her on amitriptyline, and administered osteopathic manipulation. (Id.) She received another osteopathic manipulation on September 26, 2007 for low back pain. (Tr. 370.)

On October 29, 2007, plaintiff reported a stiff back. She obtained osteopathic manipulation and medication refills. (Tr. 400.) On November 28, 2007, she reported constant pain. She declined osteopathic manipulation, stating that even with manipulation her back would go out

again in a couple of days. (Tr. 398.) Dr. Tucker increased her Gabapentin. (Id.) On December 27, 2007, she reported back and neck stiffness and was administered osteopathic manipulation for each. (Tr. 396.)

On January 22, 2008, plaintiff saw Dr. Tucker. Her pain medication was refilled. She also complained of chronic indigestion. (Tr. 394.) Dr. Tucker suspected gluten intolerance and provided her with information on it. (Id.)

On February 20, 2008, plaintiff saw Dr. Tucker so that he could complete disability forms. She complained of pain from the mid back to the lower back, and intermittent shooting pain from the right buttock into the mid-thigh area. (Tr. 390-92.) On March 19, 2008, she received osteopathic manipulation. Blood work for her thyroid was also requested. (Tr. 389-90.)

On February 20, 2008, Dr. Tucker completed a Medical Source Statement (MSS). (Tr. 384-87.) He gave current diagnoses of thoracolumbar scoliosis; chronic low back pain with intermittent right lumbar radiculopathy; learning disability with a high school diploma but a fourth grade reading level with reading comprehension problems; hypothyroidism; depression with a history of panic disorder; and GERD. (Tr. 384.)

Dr. Tucker opined that in an 8-hour workday, plaintiff could stand 2 hours, sit 2 hours, and walk 2 hours, and that at one time, plaintiff could stand, sit, or walk 15-30 minutes at a time. (Tr. 385.) He opined that plaintiff could occasionally lift and carry up to 20 pounds; could occasionally stoop, crouch, crawl, reach overhead, or climb ladders/scaffolds; would be significantly limited in gross handling and fine fingering in both hands, but would not have reduced grip strength or pain upon gripping; and would have no environmental limitations. (Tr. 386.) He opined that her scoliosis could be expected to cause pain all day on a daily basis, and that objective indications of her pain included muscle spasms and reduced ROM. (Id.) He opined that plaintiff would need to take breaks every hour. (Tr. 387.)

In a Function Report - Adult form dated March 27, 2007, plaintiff described her daily activities as largely consisting of self-care, caring

for her 5-year-old daughter, and household chores. (Tr. 232.) She could still do the things she did before her illness, but not as frequently or for the same duration, and needed to take breaks. (Tr. 233.) Her sleep was affected in that she awakened more often and was more restless. (Id.) She had to stop a lot while doing house and yard work. (Tr. 234.) She shopped twice a month for food, clothes, or necessities. She was able to shop for two to four hours at a time, and would sometimes need to stop. (Tr. 235.) Her hobbies and interests included being with friends, and playing games such as pool, darts, and cards. She was not able to do those things very often due to her back pain. (Tr. 236.) She could lift 20 pounds; stand, sit, or kneel for 30 minutes; and could walk two blocks. She could not squat or bend well. (Tr. 237.) She stated that reading and understanding written instructions was difficult, but she was able to follow spoken instructions very well. (Id.)

In an undated and unsigned Disability Report - Adult form, plaintiff stated that she was limited in her ability to work due to a learning disability, scoliosis, and depression. (Tr. 249-50.) She was limited in what she could lift, that she could not sit or stand for any length of time due to her scoliosis, and that she had trouble with reading comprehension. (Tr. 250.) She had stopped working June 30, 2003 due to her condition, but also became unable to work on February 3, 2007. (Id.) She stated that in the past 15 years she had worked as a cashier, a hospital laundry worker, a housekeeper, and in a factory. (Tr. 250-51.) She had completed the 12th grade and had attended special education classes. (Tr. 256.)

In another undated and unsigned Disability Report - Appeal form, plaintiff stated that since March 13, 2007, her condition had worsened in that she was sleeping less, hurting more, and taking more medication. (Tr. 260-65.) She listed her medications as Hydrocodone, for back pain; Levothyroxine, for low thyroid; Gabapentin, a muscle relaxant; and Citalopram, an antidepressant. (Tr. 267.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on March 14, 2008. (Tr. 21-92.) Plaintiff testified to the following. She has past work experience as a fast-food worker, housekeeper, hospital laundry worker, factory worker, Walmart employee, gas station clerk, and child care worker. (Tr. 30-34.) She is unable to do any of those jobs on a full-time basis because of pain and the need to take medication for it. (Tr. 35.) She has back pain daily, with the intensity varying from 5 to 9 on a 10-point scale. Her pain is usually a 7. (Tr. 36-38.)

She lives down the street from her mother and tries to visit her daily. (Tr. 39.) She has been seeing Dr. Tucker, her treating physician, for more than seven years. (Tr. 39-40.) She is in more pain now than when she was working, and would be able to work if not for her pain. (Tr. 41.) She is unable to go eight hours straight without needing to lay down or recline. (Id.) Reading comprehension has always been difficult. Her depression was currently under control. (Tr. 41-42.)

She sees her case worker once a week, which helps her maintain control. (Tr. 42.) She is not married and lives in a trailer home with her daughter. (Tr. 53.) She spends about four hours a day, including breaks, cleaning it. (Tr. 43-44.) Other than seeing her mother, she does not get out much except when her caseworker takes her shopping. (Tr. 44.) Her caseworker also helps her pack and carry groceries. (Tr. 45.) She is able to cook, take the garbage out, and do laundry. Her stepfather helps with yard work. (Tr. 45-46.) Her mother and stepfather both received disability. (Tr. 54.) Standing is easier than sitting. (Tr. 47-48.) She is able to walk her daughter to the bus stop, less than a block away. (Tr. 48-49.) She is able to walk with her mother, and they walk about a mile in 30 minutes. (Tr. 49.) She does not have problems with her hands. (Tr. 51.)

She has never had back surgery. (Tr. 55.) Her pain has worsened since an earlier administrative hearing. (Tr. 55-56.) When asked why she was not able to work, she testified that she would have to miss too much work due to pain and she would be unable to work five consecutive days. (Tr. 60, 63-64.)

Vocational Expert (VE) John McGowan also testified at the hearing. (Tr. 66-90.) The VE testified that plaintiff had no transferable skills

from prior employment. (Tr. 70.) The ALJ asked the VE to assume a hypothetical younger individual; who has a highschool education; who has been diagnosed with a learning disability, scoliosis, hypothyroidism, and depression. The individual could occasionally lift up to 20 pounds; alternatively sit and stand six out of eight hours in a workday with appropriate rest periods; sit for at least a half an hour, stand for an hour, and could push and pull within those weight limits, climb ropes and stairs occasionally; never climb ladders, ropes, and scaffolds; and occasionally balance, kneel, crouch, and crawl. The VE testified that such an individual would not be able to return to her past relevant work (PRW), but that there were other jobs in the light category that the individual could perform, such as cashier, gate guard, and security systems monitor. (Tr. 73-80.)

In response to a hypothetical question from plaintiff's attorney based on Dr. Tucker's MSS, the VE testified that such an individual would not be able to return to any of plaintiff's PRW or any other work existing in significant numbers in the national economy. (Tr. 87-88.)

### III. DECISION OF THE ALJ

On June 26, 2008, the ALJ issued an unfavorable decision. (Tr. 5-18.) At Step One, the ALJ determined that plaintiff had not engaged in substantial gainful activity since February 15, 2007, her application date. (Tr. 10.) At Step Two, the ALJ found that plaintiff had the severe impairments of scoliosis; somatic dysfunction of the cervical thoracic and lumbar spine; GERD; hypothyroidism; degenerative joint disease of the knees; history of a learning disorder; and borderline intellectual functioning. (Id.) The ALJ found that her depression was not severe and that plaintiff was not alleging disability based on an affective mood disorder. The ALJ found that carpal tunnel syndrome was not medically determinable upon the record. (Id.) At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing. (Id.)

The ALJ determined that plaintiff had the RFC to perform "light" work as defined in 20 C.F.R. § 416.967(b), except that she could

alternately sit or stand for six out of eight hours in a workday with appropriate rest periods; that for her own comfort she could sit continuously for at least one-half hour and stand continuously for one hour; that she could push-pull within the exertional limits for light work; that she could never climb ladders, ropes, or scaffolds; that she could occasionally balance, kneel, crouch, and crawl; that she had no manipulative limitations; that she "should avoid all exposure to vibration secondary to the possibility of vibration exacerbating [her] scoliosis;" and that she would have moderate limitations in her ability to understand, remember, and carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 10-11.)

At Step Four, the ALJ found that plaintiff could not perform any of her past relevant work. (Tr. 16.) At Step Five, the ALJ found that given plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform, i.e., cashier II, gate guard, and sedentary security system monitor. (Tr. 17.) Accordingly, the ALJ concluded that plaintiff was not disabled. (Id.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in

-10-

death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her PRW. Id. The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in concluding that Dr. Tucker's treatment was "conservative," in failing to state the weight given to his opinion, and in rejecting his opinion. She also argues the ALJ erred in determining her RFC.

### A. Opinion of Dr. Tucker, treating physician.

Plaintiff argues the ALJ erred in characterizing Dr. Tucker's treatment as "conservative." She argues that the ALJ believed Dr. Tucker's treatment, osteopathic manipulation, and pain medication was "conservative" and inconsistent with Dr. Tucker's opinions about her limitations. She argues osteopathic manipulation is standard osteopathic treatment, not some particularly conservative method of treatment. (Tr. 11-12, 14-15.)

"Conservative treatment" denotes treatment by gradual, limited, or well established procedures, as opposed to radical. Stedman's Medical

-11-

Dictionary, 433 (28th Ed. 2006). The record demonstrates that plaintiff received osteopathic manipulations and pain medications from Dr. Tucker. She did not require emergency room visits, hospitalizations, or surgeries to control her impairments. The undersigned concludes the ALJ properly characterized Dr. Tucker's treatment as "conservative."

Plaintiff next argues the ALJ erred in rejecting Dr. Tucker's opinions and in failing to state the weight accorded to his opinions. The court disagrees.

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). See 20 C.F.R. § 404.1527(d)(2). An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions. A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Id.; see also Hacker, 459 F.3d at 937; 20 C.F.R. § 404.1527(d)(2). It is the ALJ's duty to resolve conflicts in the evidence. See Hacker, 459 F.3d at 936.

Dr. Tucker opined that plaintiff was incapable of working an 8-hour workday. (Tr. 385.) He opined that plaintiff could occasionally lift 20 pounds, and sit, stand, and walk for 2 hours in an 8-hour workday for 15 to 30 minutes at a time each. (Tr. 385.) Dr. Tucker also suggested significant limitations in plaintiff's ability to lift, sit, stand, and walk. He opined that plaintiff's learning disability limited her to a fourth grade reading level. (Tr. 384.)

The ALJ considered Dr. Tucker's opinion and the record as a whole to conclude that Dr. Tucker's suggested limitations were not supported. (Tr. 12, 14-15.) The ALJ found that Dr. Tucker's opinion was entitled to weight to the extent that it was consistent with his RFC finding. (Tr. 15.) The ALJ noted that Dr. Tucker's records did not refer to a fourth grade reading level prior to completing the assessment. (Tr. 391.) The

record also does not identify any limitations in plaintiff's ability to lift, sit, stand, and walk. (Tr. 283, 299, 301, 307, 309, 311, 313, 323-24, 326, 329, 332, 335, 338-39, 369, 371, 373, 377, 379, 381-82, 390, 397, 401.) Specifically, Dr. Tucker found no muscle weakness, no gait or station disturbance, and no sensory deficits. (Tr. 283, 299, 301, 307, 309, 311, 313, 323-24, 326, 329, 332, 335, 338-39, 369, 371, 373, 377, 379, 381-82, 390, 397, 401.)

Dr. Tucker's opinion is also inconsistent with plaintiff's testimony at the hearing. (Tr. 15.) Dr. Tucker opined that plaintiff had limitations in her ability to engage in gross manipulation and fine finger movement. Plaintiff, however, testified that she had no such limitations. (Tr. 51, 386.) Dr. Tucker's opinion is also inconsistent with plaintiff's testimony as to activities of daily living. Cf. Owen v. Astrue, 551 F.3d 792, 799 (8th Cir. 2008) (claimant's activities of daily living do not reflect the physical limitations found by her physician). As discussed above, plaintiff's daily activities support an ability to perform a range of light work.

The regulations require the ALJ to assess the record as a whole to determine whether the treating physicians' opinions are inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). The court concludes the ALJ did so here and diminished the weight given Dr. Tucker's opinions for proper reasons.

**B.   Residual Functional Capacity**

Plaintiff argues the ALJ failed to properly assess her RFC. The undersigned disagrees.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a). While the ALJ is not restricted to medical evidence alone in

-13-

evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. Defendant has the burden of proof for an assessment of RFC that will be used to prove that a claimant can perform other jobs in the national economy. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).

Here, the ALJ determined that plaintiff had the RFC to perform "light" work as defined in 20 C.F.R. § 416.967(b), except that she could alternately sit or stand for six out of eight hours in a workday with appropriate rest periods; sit continuously for at least one-half hour and stand continuously for one hour "for her own comfort;" push-pull within the exertional limits for light work; never climb ladders, ropes, or scaffolds; occasionally balance, kneel, crouch, and crawl. She had no manipulative limitations. She should avoid all exposure to vibration secondary to the possibility of vibration exacerbating her scoliosis. She would have moderate limitations in her ability to understand, remember, and carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 10-11.)

Plaintiff argues the RFC is not adequately supported by medical evidence, because the only sources who gave opinions relating to her limitations were Dr. Tucker and Dr. Hutson, a non-examining state agency reviewing psychologist who completed her Mental RFC Assessment form. She argues the ALJ erred in rejecting limitations set forth by Dr. Tucker regarding sitting, standing, walking, and the need for hourly breaks, and in accepting the limitations given by Dr. Hutson. She argues the ALJ also appears to have accepted most of Dr. Hutson's conclusions, while acknowledging they were from a non-physician.

The ALJ properly considered that plaintiff's allegations were inconsistent with the record as a whole, including the medical evidence, the fact that her she generally improved with treatment, and her daily activities. (Tr. 11-16.) The ALJ's consideration of plaintiff's subjective complaints also comported with the regulations, 20 C.F.R. § 416.929 (2010), and the framework set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). To analyze a claimant's subjective complaints of pain, an ALJ considers: 1) the claimant's daily activities; 2) the

duration, frequency and intensity of pain; 3) dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5) functional restrictions.  See 20 C.F.R. § 416.929; see also Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003)(where ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so, the court will normally defer to the ALJ's credibility determination).  The record evidence supported the ALJ's determination that plaintiff was not fully credible.

As discussed earlier, the record evidence demonstrates that plaintiff's impairments generally improved with treatment.  The ALJ also properly reviewed the medical records and found that the objective findings did not support her subjective allegations.  (Tr. 11-12, 15.) See 20 C.F.R. § 416.929(c)(1)-(2) (ALJ should look at medically documented "signs" and findings to determine intensity and persistence of symptoms and how they actually affect the person); Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider").

The record evidence revealed a restricted ROM in plaintiff's spine. (Tr. 300, 308, 310, 315, 318, 324, 330, 333, 336, 370, 372, 376, 380, 389, 395-96, 398, 400.)  However, plaintiff did not show any sustained gait disturbances, muscle weakness, or sensory deficits.  (Tr. 283, 299, 301, 307, 309, 311, 313, 323-24, 326, 329, 332, 335, 338-39, 369, 371, 373, 377, 379, 381-82, 390, 397, 401.)  Nor do Dr. Tucker's records reveal any findings that suggest plaintiff could not perform a range of light work. Dr. Tucker suspected fibromyalgia, but the evidence does not support the diagnosis.  (Tr. 304, 370-71, 373-74, 376, 382.)  Dr. Tucker noted that plaintiff had pinpoint areas of tenderness consistent with fibromyalgia; however, he did not identify the number or location of the points.[4]  (Tr. 374.)

The record also shows inconsistencies between plaintiff's subjective allegations and the record as a whole.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (subjective complaints may be discounted if evidence

---

[4]Diagnosis requires 11 of 18 specific tender points. Stedman's at 725.

-15-

as a whole is inconsistent with claimant's testimony). Plaintiff alleged disability based on a learning disability and told Mr. Aamoth she was limited to a fifth grade reading level. (Tr. 42, 250, 279-80, 288.) However, despite her learning disability, plaintiff performed substantial gainful activity in 1997 and 1998 and ceased working for reasons unrelated to her impairment. (Tr. 218.) See Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009) (it was relevant that claimant did not leave laborer position because of any back injury but was laid off due to a decline in work, the same date of his alleged onset date). Here plaintiff stopped working because she did not have child care or transportation to work, not due to her alleged disability. (Tr. 32, 147, 279.)

The ALJ also considered plaintiff's activities of daily living in evaluating her credible limitations. (Tr. 13-14, 16.) Plaintiff testified she was able to maintain her personal care, prepare meals, care for her daughter, play on the floor with her daughter, walk with her mother, clean her house, do laundry, grocery shop, read, watch television, spend time with her friends, and sometimes shoot pool, play darts, and bowl. (Tr. 29-39, 59, 45-46, 232-36, 241-42, 295-96.) These daily activities are consistent with an ability to perform a range of light work. See 20 C.F.R. § 416.929(c)(3)(i); Cf. Medhaug, 578 F.3d at 817 (cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain).

## VI.  CONCLUSION

For the reasons set forth above, the court finds that the decision of the ALJ is supported by substantial evidence on the record and is consistent with the Regulations and applicable law. The decision of the Commissioner of Social Security is affirmed. An appropriate judgment order is issued herewith.

    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 22, 2011.